# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, : | |
| : | Case No. 3:07-cr-00244 |
| Plaintiff, : | |
| : | |
| v. : | JUDGE ALGENON L. MARBLEY |
| : | |
| : | |
| MICHAEL SPICER, : | |
| : | |
| Defendant. : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter comes before the Court on the Motion to Suppress Evidence by Defendant Michael Spicer ("Spicer"). Spicer alleges that the evidence in question was obtained as the result of a search which violated the Fourth Amendment of the United States Constitution and Article I of the Ohio Constitution. The Court held a suppression hearing on February 18th and 19th of 2008. For the reasons set forth herein, this Court **DENIES** the Defendant's Motion.

### II. STATEMENT OF FACTS

On Wednesday, July 25, 2007 at 9:12 p.m., Spicer checked into room 249 at the Courtyard-Marriott Hotel, Columbus Airport location (the "Marriott"). The room was paid for in cash. Spicer also deposited an extra $100, which was required by the Marriott for guests paying cash. In the event of a violation of Marriott's non-smoking policy, the deposit would be retained.

On the morning of July 26th, Spicer exited his room, leaving the room unattended and locked. His personal belongings remained in the room. Spicer claimed that due to the smoking policy of the hotel, he went to his car, which was parked in the hotel parking lot, to smoke. While

in the parking lot, Spicer met an employee of the hotel and both of them began smoking a blunt, marijuana rolled in cigar paper. Spicer alleged at the suppression hearing he did not smoke anything in the hotel room.

While Spicer was out of his room taking his smoking break, a hotel housekeeper, Nicole Shaw ("Shaw"), went to room 249 to clean. The room was marked on her assignment sheet V & D (vacant and dirty). Because the room was marked V & D, she believed the room to be vacant at that time. When she entered the room, she immediately smelled smoke and saw what she believed to be marijuana residue. There is some inconsistency as to whether she smelled cigarette smoke or marijuana smoke. Regardless, she believed she smelled smoke, and smoking any substance is a violation of the Marriott's Policy. The Marriott has a non-smoking policy and will charge an extra fee for Room Recovery. (See Marriott Policy on Smoke Free Non-Compliance). Shaw's supervisor followed her into room 249 and informed her that she should notify the front desk.

The front desk was called and notified that there was a violation of the smoking policy in room 249. There is some inconsistency as to whether Shaw or another housekeeper notified the front desk of the smoking violation. From the testimony, it appears that Shaw contacted the Human Resources and Accounting Supervisor, Delmeka Richardson ("Richardson"), but another housekeeper also contacted the front desk and notified the Assistant Manager, Quinn Miller ("Miller").

Richardson and Miller took the hotel digital camera and went to room 249 to document the smoking infraction. Believing the room to be vacated, Richardson used his manager's key to enter the room. When Richardson and Miller entered the room, they both saw cigarettes on one

of the beds and debris of the floor between the beds. Richardson thought it appeared to be cigar shellings. Miller thought it appeared to be brown colored debris and marijuana buds. Their observations were confirmed by Spicer's own testimony, because he admitted at the hearing that he had tried to dump the remains of his blunt shell into the trash can, but some of it fell out on the floor. Richardson smelled smoke, but does not know if it was tobacco or marijuana smoke. Miller cannot recall smelling smoke. They took three photographs: one of the cigarettes, one of the blunt shells on the floor, and one of a lighter that was on the bed.[1]

Upon further examination, Miller saw a shirt and cell phone lying on one of the beds, but did not see any other clothing or luggage in the open. He did a sweep of the room to find if anything else had been left behind by the guest, as he believed the guest had checked out. Upon pulling out the desk chair, he found a black backpack on the chair. At that point in time, he still believed the guest had checked out, and that this bag had been overlooked as it was on a desk chair pushed under the desk. He believed this was an object he would take to lost-and-found. He unzipped the bag to check for identification and saw objects wrapped in celophane inside the bag. He turned to Richardson and showed her the inside of the bag and told her there might be an issue. They both thought the objects contained illegal substances. He asked her to contact the front desk to notify the General Manager and to contact the police. He then returned the bag to the chair. He does not recall zipping up the bag.

After having been notified of what was found in room 249, the General Manager, Lamarr Barr ("Barr") informed Richardson that he would re-key the room to secure it. Richardson and Barr both believed the Marriott had the authority to evict the guest for illegal conduct. Barr and

---

[1] These photos were emailed to Detective Peters at his request.

the Chief Engineer went to inspect the room further and confiscate the room back. Upon arriving at the room, Barr swiped his card through the lock, so he believed he had re-keyed it. While in the room, Barr testified that he observed tobacco shell casings and green stems on the floor around the trash can between the two beds and smelled marijuana smoke. He also observed the unzipped book bag and could see the wrapped objects inside. He believed the objects contained drugs. They exited the room and believed it to be secure, as the door locked behind them.

Two Columbus police officers, one of whom was Officer Laura Evans ("Officer Evans"), arrived first at the Marriott approximately ten minutes after they were called. The officers had received a dispatch that someone had checked out of a hotel room and the hotel staff had found a bag full of what they believed was narcotics. Barr and the Chief Engineer met up with the officers in the lobby landing area. Barr informed them that the smoking policy had been violated, so he had re-keyed the room and retook possession. They then proceeded to room 249.

Barr swiped his key and pushed open the door to room 249. Before it had completely opened, the door was pushed shut from the other side by Spicer. Barr was very surprised to find someone pushing the door back at him because he thought he had already locked anyone out of the room. Barr informed Spicer he was the General Manager. One of the officers then either asked or demanded Spicer come out of the room. According to Officer Evans and Barr, they requested Spicer exit the room, but according to Spicer it was demanded. Regardless, he came out into the hall, closing the door behind him. The General Manager informed him about the hotel smoking policy, but Spicer explained he had just been smoking a blunt. According to Officer Evans, Barr, and another employer, Brian Stewart, Spicer stated he had just been smoking a blunt. According to Spicer, he informed them he had been smoking a blunt in the

parking lot with a hotel employee, and had not been smoking at all in his room. However, he did not testify that he had not rolled and prepared the blunt in the room.

The officers and Spicer waited outside the door for the Detectives (narcotics officers) to show up. Spicer was not permitted to reenter the room. At this point in time, he was being detained, though he had not yet been arrested. From the evidence, it appears the Detectives, John Dozer ("Detective Dozer") and Jerry Peters ("Detective Peters"), from the multi-jurisdictional federal task force in Columbus, Franklin County, Ohio showed up about ten minutes later. Spicer asserts he waited for at least 30 minutes. However, every other person testified it was about ten minutes. In any event, when the Detectives arrived, Miller, the Assistant Manager, informed them he had seen a bag inside room 249 that he believed contained narcotics. Then, Barr, the General Manager, informed them about the situation, and specifically told them he had also seen a bag inside room 249 that he believed contained narcotics. He then told the Detectives he would take them up to the room and show them what had been found. Barr took the Detectives to room 249 and used his master key to open the room, and they followed him inside. At that time, they did not know that Spicer had ever reentered the room and were under the belief that the hotel room had been secured before the first officers arrived.

According to Detective Dozer, they entered the room to secure the room before getting a warrant because they will not leave officers stationed outside the room until they have ensured that no one else is hiding in the room. Detective Dozer asserts this was done as a safety precaution prior to obtaining a warrant. According to the Detectives and Barr, they were in the room for two minutes at most. According to Spicer they were in the room for five minutes.

The Detectives made a sweep of the room, including looking in the bathroom and under

the bed. Barr and Detective Dozer testified that the Detectives did not move or touch any of the objects in the room. Detective Dozer testified that he saw the backpack in plain view in the desk chair with what appeared to be three kilos of cocaine inside. He also testified he could smell cigarette and marijuana smoke and saw tobacco shavings on the floor. Detective Dozer testified that he they did not touch the backpack or unzip it. Spicer asserts, however, that the backpack was zipped when he exited the room.

After sweeping the room, the Detectives and Barr exited. The Detectives left to obtain a search warrant and Spicer was arrested. According to Detective Dozer, it is their policy to obtain a warrant. However, he testified that he believed they had probable cause to search the room even without obtaining the warrant, because they believed Spicer had been evicted and the General Manager had given them consent to enter the room.

Franklin County, Ohio Municipal Court Judge Julia Dorrian signed the warrant, and the Detectives and other task force officers returned to room 249 to execute the warrant. They also obtained a warrant to search Spicer's car. Detective Dozer took pictures of the hotel room and observed the car search. They sent the three celophane wrapped brick shaped objects found inside the book bag to the lab to be tested. The lab indicated that the bricks were cocaine and weighed 2.970 kilograms.

### III. LAW AND ANALYSIS

The Fourth Amendment bars the government from conducting unreasonable searches and seizures. This constitutional protection also applies to hotel rooms. *U.S. v. Allen*, 106 F.3d 695, 698 (6th Cir. 1997). This is because "an occupant of a hotel room has a reasonable expectation of privacy there, even though he is just a guest, not an owner, of the room." *U.S. v. Caldwell*, 518

F.3d 426, 429 (6th Cir. 2008). Under the Fourth Amendment, searches "conducted without a warrant issued upon probable cause [are] per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Ohio Constitution provides the same protections as the Fourth Amendment. *State v. Homes*, 856 N.E.2d 980, 980 (Ohio 2006).

Various issues have been implicated by the facts presented at the Suppression Hearing, such as whether the Defendant had been evicted from his room and thus whether he had a reasonable expectation of privacy, and whether the Detectives were permitted to execute a protective sweep prior to obtaining the search warrant. Whether the evidence should be suppressed, however, turns solely on the private search doctrine.

The Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with participation or knowledge or any governmental official." *U.S. v. Jacobson*, 466 U.S. 109, 113 (1984) (internal quotations omitted); *U.S. v. Williams*, 354 F.3d 497, 509 (6th Cir. 2003). The hotel employees were acting as private individuals and not government agents; therefore, Spicer's constitutional rights were not violated by any search conducted by the Marriott housekeeper, the Assistant Manager and HR Supervisor, or the General Manager and Chief Engineer.

Furthermore, a Fourth Amendment violation also does not occur when a private individual summons law enforcement officials who retrace the private search. *Williams*, 354 F.3d at 509. "[A]dditional invasions of privacy by a government agent following on the heels of a private search must be tested by the degree to which they exceeded the scope of the private

-7-

search." *Id.* (internal brackets omitted). The government may not exceed the scope of the private search unless it has an independent right to search. *Id.* "However, the government's confirmation of prior knowledge learned by the private individuals does not constitute exceeding the scope of a private search." *U.S. v. Richards*, No. 07-5802, 2008 WL 4935965, at *3 (6th Cir. Nov. 18, 2008). If officers examine objects that the private parties did not examine, the officers have exceeded the scope of the private search. *Id.* But officers do not exceed the scope of the private search if they merely look at the same materials examined by the private parties. *Id.*

In *Richards*, there was no Fourth Amendment violation because the officers "merely confirmed what was found by the private searchers." *Id.* (they looked into and stepped into the hotel room to confirm the allegations that it contained child pornography ). "The initial search of the unit by [hotel] employees had already occurred and therefore viewing the contents of the unit as they laid in plain view cannot be deemed as exceeding the scope of the private search." *Id.* Once the search warrant arrives, the officers could exceed the scope of the private search. *Id.*

In *U.S. v. Clutter*, 914 F.2d 775 (6th Cir. 1990), a police officer opened a drawer that had previously been opened in a private search and saw what the private searchers had told him they had seen. *Id.* at 779. "He learned nothing as the result of his own conduct that he had not already heard about as the result of the private search . . . he only confirmed the fruits of their private search." *Id.* Therefore, the court held that the government did not exceed the scope of the private search or infringe upon any constitutionally protected privacy interest. *Id.*

In this case, Marriott employees summoned the Detectives to the hotel and informed them about what they had observed, of most importance, brick like objects wrapped in cellophane that appeared to be narcotics. The Detectives entered room 249 and looked in the black book bag,

which the employees had reported contained the objects that appeared to be narcotics. The General Manager and the Detectives testified that the bag had been left unzipped when they entered the room to do the sweep (the Assistant Manager testified that he had earlier unzipped the bag). However, Spicer testified that he had zipped the bag before the General Manager and Detectives entered the room.

Irrespective of the conflicts in the testimony, and taking Spicer's testimony as true, the Detectives were allowed to retrace the steps of the private search. Even if the Detectives unzipped the book bag, they were merely looking at the same materials examined by the private parties. Detectives opening a book bag that had previously been opened in a private search is absolutely no different than a police officer opening a drawer that had previously been opened in a private search. *See Clutter*, 914 F.2d at 779. They learned nothing as the result of their own conduct that they had not already heard about as the result of the private search; rather, they "only confirmed the fruits of their private search." *Id.* They then obtained a search warrant based on the information provided by the private search, which they had confirmed. After obtaining this warrant, they were justified in expanding their search and seizing items in the hotel room. Therefore, Spicer's constitutional rights were not violated by the Detectives' search of the hotel room, prior to obtaining a search warrant.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress.

**IT IS SO ORDERED.**

                                                s/Algenon L. Marbley
                                                **ALGENON L. MARBLEY**
                                                **UNITED STATES DISTRICT JUDGE**

**DATED: February 25, 2009**